IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT LAUCELLA,

    Petitioner,                                     No. CIV S-08-109 LKK CHS P

    vs.

D.K. SISTO,

    Respondents.             <u>FINDINGS AND RECOMMENDATIONS</u>

                                        /

## I. INTRODUCTION

Petitioner Robert Laucella is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254. Petitioner is currently serving an indeterminate life sentence following his 1971 conviction in Santa Clara County by plea of guilty to first degree murder with use of a firearm. Petitioner does not challenge the constitutionality of his conviction, but rather, the execution of his sentence, and specifically, Governor Schwarzenegger's August 31, 2006 reversal of 2002 decision of the Board of Parole Hearings ("Board") finding him suitable for parole.

## II. BACKGROUND

The facts of petitioner's life crime were set forth in the unpublished opinion of the California Court of Appeal, Sixth District:

1

On September 11, 1971, at approximately 5:00 p.m. Laucella, age 20, and two 19-year-old friends robbed a musical instrument store. Laucella shot the store clerk in the chest with a small caliber handgun. Police were called to the scene of the robbery at approximately 10 minutes to 6:00 p.m. When they arrived the store clerk was lying face down on the floor. He had a small round puncture wound in his chest and was in a state of semi-consciousness. He was taken by ambulance to the hospital where he died five hours later, after surgery.

Before he went into surgery, he told the police that he had been working inside the Moyer Music Store and was waiting on two subjects that were interested in buying some musical instruments. The suspects had told him to open up the rear door of the store so that they could load the equipment that they were purchasing into the van. He replied that the doors were locked and he would not open any rear doors until they finished the transaction. He continued to talk with the two suspects and one of these individuals, subsequently identified as defendant Laucella, reached into the waist area of his pants and produced ... a .22 caliber automatic pistol. Defendant Laucella pointed the weapon at the victim and fired one shot at him. After this shot was fired and the victim was hit, defendant Laucella stated, 'Sorry, don't worry, it's just a flesh wound- good shot.' As he was lying on the floor, the store clerk thought he heard a motorcycle come to the front of the store and then observed a third subject walk to the front door. The third robber then entered this establishment and questioned defendant Laucellas as to why he had shot the victim and for him to call an ambulance. The victim also told the police that Laucella and the second robber had been in the store earlier that day.

A married couple parked in front of Moyers' saw someone standing in the doorway of the store. The man of the couple thought the store sign said "open" when they arrived, but then he noticed the sign said "closed." The couple heard a muffled sound they could not identify and the man thought he saw something fall. At this time defendant Laucella came out of the store and walked over to the car window. He said they were making a movie of an actual robbery and that the witnesses were in it. Laucella said the camera was at the gas station nearby. Laucella then went back into the store. One of the other suspects exited the store and walked towards the back of the shopping center. The couple saw Laucella parking a reddish van with curtains.

At 7:15 p.m. police responded to a call from defendant Laucella's home to assist an ambulance crew with a mentally ill person. Laucella's girlfriend informed police that Laucella had just been released from Agnews State Hospital and that his father wanted him recommitted. Defendant was taken by ambulance to the Santa Clara Mental Health Center. Later, he was transferred to Agnews; he gave a false name, his brother's. At Agnews, nine .22 caliber

1   bullets were found in his pocket.

2   At approximately 9:00 p.m., the police were again called to the
defendant's home.  At this time defendant's brother, Daniel, turned
3   over a .22 caliber automatic with an expended cartridge in the
chamber.  Daniel told police he had taken the gun from his brother,
4   who had admitted shooting someone because of "bad vibrations."
Daniel also said his brother had borrowed a van, and that it was
5   parked across the street.  The van contained an amplifier and
numerous drum sticks.  Police learned from questioning family
6   members that Laucella had been committed to Agnews on
September 4, 1971, for drug abuse and had been released on
7   September 10 at 2 p.m.  After his release, defendant behaved
normally and did not show signs of drug usage.  The following day
8   [the date of the offense], he left home at 12:30 p.m. and returned
between 5:30 and 6:00 p.m, indicating that he had an engagement
9   with his band.

10  Defendant Laucella was taken from Agnews to the police
department where blood and urine samples were taken and he was
11  questioned.  He denied any knowledge of a shooting and denied
knowing his codefendants.  On September 12, Laucella's co-
12  defendants, Valdez and Satter, turned themselves in.

13  ... In his statement to the probation officer, Laucella said he and the
others did not plan or discuss robbing the store, and he did not
14  remember pulling the trigger... He admitted that he took the gun
from Satter's car with Satter's permission about two months prior.
15  He also admitted being an occasional user of LSD and marijuana,
but said he had not taken any drugs that day. [Laucella further
16  stated that] after he shot the victim, he did have [an LSD]
flashback.

17

18  (Pet. Ex. B. at 3-8) (internal brackets, quotations and ellipses omitted).

19          Petitioner pleaded guilty to first degree murder and admitted the use of a firearm.

20  (*Id*.)  He was sentenced to an indeterminate life term in prison.  After serving slightly more than

21  five years, petitioner escaped from his place of incarceration, the Duel Vocational Institute in

22  Tracy.  (*Id*.)  He was apprehended the following day.  (*Id*.)  Petitioner was eventually sentenced

23  to an additional term of six months to five years for the escape offense, to be served concurrently

24  to his life sentence.  (*Id*.)

25          On August 29, 1979, at his initial parole consideration hearing, petitioner was

26  given a parole date of October 8, 1985.  (Pet. Ex. Q.)  A few months later, on December 15,

1979, petitioner again escaped from his place of incarceration and his parole date was rescinded.[1] (Pet. Ex. B at 2) He remained at large for six years and five months. (*Id*.) During that time he formed a common-law marriage relationship with a woman and fathered a son. (*Id*.) Petitioner broke no laws and remained clean and sober while free. (*Id*.) He was apprehended on May 23, 1986, in Portland, Oregon, when he went to meet a friend who was under FBI surveillance. (*Id*.) Petitioner has been in continuous custody since his apprehension in 1986. (*Id*.) His minimum eligible parole date passed on August 6, 1978. (*Id*. at 9.)

On August 14, 2002, the Board conducted petitioner's thirteenth subsequent (fourteenth overall) parole suitability hearing and determined that petitioner was suitable for parole because he would not pose an unreasonable risk of danger to society or a threat to public safety if released.[2] (Pet. Ex. B at 2) On January 10, 2003, former Governor Davis reversed the Board's decision, concluding that the gravity of the crime had not been sufficiently considered, and also that petitioner still needed to address his drug problem through "substance abuse counseling and psychiatric treatment." (*Id*.)

Petitioner sought habeas corpus relief in the Santa Clara County Superior Court. (Pet. Ex. B at 2.) The superior court granted relief, finding that the governor's exercise of discretion, which was then a newly enacted power, breached petitioner's plea bargain in violation of the Due Process and Contract Clauses of the United States Constitution. (*Id*. at 3.) The superior court ordered petitioner's immediate release. (*Id*.) Respondent appealed the order, and the California Court of Appeal, Sixth District, granted a stay pending appeal. (*Id*.) The state appellate court ultimately affirmed the grant of relief, but modified the form that relief would take:

---

[1] Petitioner was again convicted of escape, but this time the conviction was reversed on appeal. (Pet. Ex. T.)

[2] Subsequent to petitioner's August 14, 2002 favorable parole suitability determination, he was again found to be suitable for parole after a June 8, 2005 hearing; this subsequent grant of parole was reversed by Governor Schwarzenegger on May 5, 2006. (Pet. at Ex. L.)

> We conclude that the trial court erred in its determination that the Governor's exercise of his power to reverse the Board's grant of parole violated Laucella's plea bargain and the contract and due process clauses. We also conclude that while some of the Governor's findings are supported by "some evidence" (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658), other findings are not. Furthermore, the Governor failed to consider regulatory factors favoring suitability. Under these circumstances, the appropriate disposition is not Laucella's release, as ordered by the trial court, but remand to the Governor for reconsideration of his decision in light of the views expressed in this opinion and the dictates of due process. Accordingly... we modify the trial court's order granting Laucella's petition on the grounds stated and ordering his immediate release. As modified, we affirm the court's issuance of the writ of habeas corpus and remand to the trial court which shall direct the Governor to reconsider Laucella's parole suitability in accordance with due process and the views expressed in this opinion.

(Pet. Ex. B. at 3.)

In accordance with the state appellate court's remand, the Santa Clara County Superior Court ordered Governor Schwarzenegger to vacate former Governor Davis's January 10, 2003 decision and re-review the Board's August 14, 2002 grant of parole in light of the views expressed in the state appellate court's opinion. On August 31, 2006, Governor Schwarzenegger issued a written decision which once again reversed the Board's August 14, 2002 grant of parole. (Pet. Ex. A.) Petitioner challenged the governor's August 31, 2006 reversal in a petition for writ of habeas corpus filed in the California Supreme Court; the petition was denied without written explanation of the court's reasoning. (Pet. Ex. C.) This action followed.

### III. ISSUES PRESENTED

Petitioner claims that the governor's reversal violated his federal rights including those secured by the Due Process Clause, the Contract Clause, the Ex Post Facto Clause, the Double Jeopardy Clause, and in addition his right to impartiality. As set forth below, it is recommended that petitioner's due process claim be found meritorious and that habeas corpus relief granted on that basis.

/////

## IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001). Because there is no reasoned state court opinion with respect to Governor Schwarzenegger's August 31, 2006 reversal, an independent review will be conducted to determine whether the California Supreme Court's unexplained decision was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by Supreme Court.

## V.  DISCUSSION

### A.  Due Process Claim

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law.  A person alleging a due process violation must first demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not

6

constitutionally sufficient. *Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause itself or from state laws. *Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987). The United States Constitution does not, in and of itself, create a protected liberty interest in a parole date. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981). However, where a state's statutory parole scheme uses mandatory language, it "creates a presumption that parole release will be granted" when or unless certain designated findings are made, thereby giving rise to a constitutional liberty interest. *McQuillion*, 306 F.3d at 901 (*quoting Greenholtz v. Inmates of Nebraska Penal*, 442 U.S. 1, 12 (1979)). The Ninth Circuit has conclusively determined that California state prisoners who have been sentenced to prison with the possibility of parole have a clearly established, constitutionally protected liberty interest in receipt of a parole release date. *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (*citing Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903; and *Allen*, 482 U.S. at 377-78 (*quoting Greenholtz*, 442 U.S. at 12)).

The full panoply of rights afforded a defendant in a criminal proceeding is not constitutionally mandated in the context of a parole proceeding. *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987). The Supreme Court has held that a parole board's procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole. *Greenholtz*, 442 U.S. at 16. In addition, the Ninth Circuit has conclusively determined that Supreme Court law clearly establishes that "some evidence" must support a parole decision. *Sass*, 461 F.3d at 1128-29; *McQuillion*, 306 F.3d at 904. Petitioner's contrary assertion that the appropriate standard requires more than some evidence is incorrect. *Id*.

Under the some evidence standard, a decision cannot be "without support" or "arbitrary." *McQuillion*, 306 F.3d at 904 (*citing Superintendent v. Hill*, 472 U.S. 445, 457

7

(1985)); *Biggs*, 334 F.3d at 915.  It must have some indicia of reliability.  *Id*.  The standard is "minimally stringent," and a decision must be upheld if there is any evidence in the record that could support the conclusion reached.  *Powell v. Gomez*, 33 F.3d at 40 (*citing Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987)); *Toussaint v. McCarthy*, 801 F.2d 1080, 1105 (9th Cir. 1986).  Examination of the entire record is not required.  *Id*.  The Supreme Court has specifically directed reviewing courts not to assess the credibility of witnesses or re-weigh the evidence.  *Hill*, 472 U.S. at 455.  The only relevant question is whether there is *any* reliable evidence in the record that could support the decision reached.  *See Id*.; *Toussaint*, 801 F.2d at 1105.

In evaluating whether some evidence supported the Board's decision, the analysis "is framed by the statutes and regulations governing parole suitability determinations in the relevant state." *Irons*, 505 F.3d at 851.  Thus, this court is bound by California's construction of its own parole suitability laws.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).  The court "must look to California law to determine the findings that are necessary to deem [a petitioner] unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by 'some evidence' [ ] constituted an unreasonable application of the 'some evidence' principle." *Id*.

Title 15, Section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for convicted murderers.  The regulation is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole.  *In re Lawrence*, 44 Cal.4th 1181, 1214, 1202 (2008).  The Board is directed to consider all relevant, reliable information available regarding

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the

        community; and any other information which bears on the prisoner's suitability for release.

15 Cal. Code Regs. § 2402(b).  The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole.  15 Cal. Code Regs. § 2402(c)-(d).  The overriding concern is public safety and the focus is on the inmate's *current* dangerousness.  *In re Lawrence*, 44 Cal. 4th at 1205.  Thus, the proper articulation of the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that a parolee's release would unreasonably endanger public safety.  *In re Shaputis*, 44 Cal.4th 1241, 1254 (2008).  In other words, there must be some rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety.  *In re Lawruence*, 44 Cal. 4th at 1227.

        Here, the Board determined that petitioner would not pose an unreasonable risk of danger to society or a threat to public safety if released, and thus that he was suitable for parole.  (Resp. Ex. 1[3] at 53.)  The Presiding Commissioner for the Board stated that the following circumstances were relied upon in reaching the conclusion that petitioner was suitable for parole:

---

[3] All citations to Respondent's Exhibit 1 refer to the transcript of the August 14, 2002 parole suitability hearing, filed in response to the Court's order of October 21, 2009.  Although respondent provided this transcript upon the court's request, respondent filed an objection to the court's use of this document, asserting that, under the AEDPA, the only documents properly reviewed are those that were before the state court.  Petitioner apparently did not include this transcript with his state court petitions.  The state courts do not develop the factual record relevant to a California inmate's parole suitability.  Where, as here, the petition is directed not at the state court judgement, but rather, at a decision of the Board or the governor, the relevant factual findings are those of the Board or the governor, respectively.  The authorities cited by respondent limiting AEDPA review to the state court record are ones that concerned collateral challenges to state court convictions where the record was limited to the state court's factual findings.  *See Holland v. Jackson*, 542 U.S. 649, 652 (2004); *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003); *Bell v. Cone*, 535 U.S. 685, 697 n.4.  In contrast, for example, the Supreme Court has held that on federal habeas review of a prison disciplinary board's decision to revoke good time credits, due process requires the prison board's findings to be "supported by some evidence in the record."  *Hill*, 472 U.S. at 454.  In determining whether the some evidence standard was met, the Court reviewed the evidence that was before the disciplinary board.  *Id*. at 456.  In this case, the transcript of petitioner's August 14, 2002 parole suitability hearing was before the governor, whose decision is at issue here, and is appropriately considered on federal habeas corpus review.

|   |   |
|---|---|
| 1 | The prisoner has no juvenile record of assaulting others.  He has a stable social history prior to prison, as exhibited by reasonably stable relationships with others.  While imprisoned, he has enhanced his ability to function within the law upon release through participation in educational programs, self-help programs, vocational programs, and institutional job assignments.  He lacks a significant criminal history of violent crime.  In fact, prior to this offense, he has no arrests or convictions whatsoever.  Because of maturation, growth, greater understanding, and advanced age, he has a reduced probability of recidivism.  He has realistic parole plans, which include a job offer and family support.  He has maintained close family ties while imprisoned via letters and visits.  And he has recently maintained positive institutional behavior, which indicates significant improvement in self-control.  He does show signs of remorse.  He's indicated that he does understand the nature and the magnitude of the offense and accepts responsibility for the criminal behavior.  And he has a desire to change towards good citizenship.  And we will also note that the inmate did commit this crime, in part, due to his recent drug-induced psychosis.  That is clearly documented.  He had been released by a mental institution the day before the murder had occurred.  The psychological factors, he has recent psych reports that have cleared him.  The first one, 9/26, 2000, which is the most recent, authored by a Dr. Wagner, Clinical Psychologist, states that his parole plans appear to be realistic.  He has a plan with a great chance of success.  That his level of dangerousness has been below the prison average and is no more than the average for a freed citizen for the past decade.  It is the case that he will not re-offend if released and would have a successful parole, if granted.  Dean Clair writes, on 6/18, 1998, that [ ] he was polite, cooperative, and unfailingly appropriate in all (indiscernible) responses.  He has no major Axis I or Axis II mental disorder.  That there were no recommendations.  That he could be expected to continue in performing his present program.  That does go back to prior reports, that again, for the past decade, have shown that the inmate is psychologically stable...

...Special conditions of parole then are to be, because of the marijuana and LSD use prior to prison, submit to anti-narcotic testing.  Submit to THC testing.  And we believe, because of the period of time, the lengthy period of time that Mr. Laucella has been in prison, and that he should attend a Parole Outpatient Clinic, which would help in his transition to free society.  I'd like to note for the record that we did give great weight to the comments of both the police department and the District Attorney's Office.  And we also gave great weight to the gravity of the commitment offense.  But we do believe that the time-- that a sufficient amount of time has passed.  That the punishment has been sufficient for the crime.  That concludes the reading of the decision. |
| 26 | (Resp. Ex. 1 at 53-55, 58-59.) |

In his August 31, 2006 written decision, in accordance with the state appellate court's mandate, Governor Schwarzenegger likewise noted the various positive factors for petitioner's release:

> I have considered various positive factors in determining whether Mr. Laucella is suitable for parole. In addition to remaining discipline-free since his return to custody in 1986, he has made efforts to enhance his ability to function within the law upon release. He earned an Associate of Arts degree, took additional college courses, and participated in various health-related courses. He completed vocational auto mechanics, has earned a certificate from the National Institute for Automotive Service Excellence, and held institutional jobs in electric and computer-assisted instruction, laundry, maintenance, and photo lab. He also availed himself of an array of self-help and therapy, including Alcoholics Anonymous, Narcotics Anonymous, Chemical Dependency Training, Alcohol/Chemical Treatment Series, Victim Offender Reconciliation Group, Men's Violence Prevention Seminar, and Arts in Corrections. He maintains seemingly solid relationships and close ties with supportive family and friends, and he received favorable evaluations from various correctional and mental-health professionals. He also has realistic, confirmed parole plans that include living with his brother in Santa Clara County, the county of his last legal residence, and pursuing a current job offer with a local construction company.
>
> In addition to the foregoing factors, I also note that, since his 2002 parole hearing, Mr. Laucella has continued to enhance his ability to function within the law upon release by completing vocational electric, and participating in further self-help and therapy, including Narcotics Anonymous and 40 days of Purpose. I have also considered that Mr. Laucella is now age 55, an age that may reduce the probability of recidivism.

(Pet. Ex. B at 2.)

Ultimately, however, Governor Schwarzenegger reached the opposite conclusion of the Board. In reversing the Board's grant of parole, the governor cited the nature and circumstances of petitioner's offense as a parole unsuitability factor. *See* Cal. Code Regs. tit. 15 §2402 (c)(1). Specifically, the governor found that the offense was carried out in a dispassionate and calculated manner (Cal. Code Regs. tit. 15 §2402 (c)(1)(B)), and that petitioner demonstrated an exceptionally callous disregard for human suffering (Cal. Code Regs. tit. 15 §2402 (c)(1)(D)). (Pet. Ex. B at 3.) The governor noted that petitioner was under a drug induced stress at the time

11

of the murder, but concluded that this was not a sufficiently mitigating factor given the overall nature and circumstances of the crime. (Pet. Ex. B at 3.) The governor agreed with the California Court of Appeal that there was no evidence supporting the conclusion that petitioner was still mentally disordered, drug dependent, or in need of psychological treatment or drug counseling. (*Id*. at 3.) But he also noted with concern that petitioner had engaged in serious criminal conduct (the escapes) since entering prison, becoming drug free, and overcoming his mental health issues. (*Id*. at 3.) In sum, the governor concluded that the gravity of petitioner's offense and his subsequent escapes outweighed the positive factors for release. (*Id*. at 4.) The governor also wrote that the commitment offense was, by itself, sufficient to conclude that petitioner's release from prison would pose an unreasonable risk to public safety. (*Id*. at 2.)

The facts of a commitment offense can alone be a sufficient basis for denying parole where they are especially heinous or particularly egregious. *In re Rosenkrantz*, 29 Cal.4th 616, 682 (2002); s*ee also Biggs v. Terhune*, 334 F.3d 910, 913-16 (9th Cir. 2003); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1126 (9th Cir. 2006); *Irons v. Carey*, 505 F.3d 846, 852-53 (9th Cir. 2007).[4] After an inmate has served the minimum number of years required by his sentence, however, extended reliance solely on unchanging factors, such as the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation. *Irons*, 505 F.3d at 853; *see also Biggs*, 334 F.3d at 917.

Petitioner's crime was undisputably dispassionate and calculated and also demonstrated a callous disregard for human suffering. Cal. Code Regs. tit. 15 §2402 (c)(1)(B) &

---

[4] In another case, *Hayward v. Marshall* (512 F.3d 536, 546-47 (9th Cir. 2008), a panel of the Ninth Circuit determined that under the "unusual circumstances" of that case, the unchanging factor of the gravity of the petitioner's commitment offense did not, by itself, constitute some evidence supporting the governor's decision to reverse a parole grant on the basis that the petitioner would pose a continuing danger to society. However, on May 16, 2008, the Court of Appeals vacated the decision in order to rehear it en banc. *Hayward v. Marshall*, 527 F.3d 797 (9th Cir. 2008). Therefore, the panel decision in *Hayward* is no longer citable precedent.

(D). The facts of his offense are not so heinous, atrocious, or cruel, however, that they continue to be predictive, on their own, of current dangerousness this many years later, given the other facts in the record demonstrating petitioner's significant rehabilitation and changes in his psychological and mental attitude. *See In re Lawrence*, 44 Cal.4th at 1221. In finding that petitioner would still pose a risk of danger, if released, the governor wrote that he "would be remiss to ignore the fact that Mr. Laucella, who says he has not used drugs since his incarceration in 1971, again engaged in serious criminal conduct (after he was drug-free) when he escaped from prison in 1977 and 1979 and remained a fugitive for more than six years." (Pet. Ex. B at 3.) Like petitioner's commitment offense, however, the fact that he twice escaped from prison is an unchanging factor for which predictive value to current dangerousness can be questioned after a long period of time. *See In re Lawrence*, 44 Cal.4th at 1226. In this case, there is no rational nexus between the heinous nature of the murder petitioner committed or his escapes from prison in the 1970s and the ultimate conclusion that he would pose an unreasonable current risk of danger to society, if paroled today.

   It must be concluded that the unchanging factors of the gravity of petitioner's commitment offense and his escapes from prison hold no predictive value regarding his *current* threat to public safety, and thus provide no support for the governor's conclusion that he was unsuitable for parole at the time of review. On the record that was before the Board and the governor, any determination that petitioner might resume violent or criminal behavior if paroled is purely speculative, and unsupported by the required modicum of reliable evidence. *Cf. In re Shaputis*, 44 Cal.4th 1241, 1259 (2008) (record supported determination that the crime was especially aggravated, *and*, in addition, that the aggravated nature of the offense indicated the petitioner still posed a current risk to public safety where the murder of his wife was the culmination of many years of violent and brutalizing behavior toward the victim, his children, and his previous wife, and the psychological report specifically qualified a finding of low risk of violence upon the petitioner's ability to avoid a relapse into alcoholism).

The role of the governor was to conduct an individualized suitability determination focusing on the public safety risk petitioner *currently* posed at the relevant time. *In re Lawrence*, 44 Cal.4th at 1217, 1221.  While Governor Schwarzenegger properly considered petitioner's individual suitability factors after the remand from state appellate court, no reliable evidence supports the only negative factors he relied upon for his decision.  The governor's finding that petitioner was unsuitable for parole based solely on the facts of his commitment offense and his escapes from prison is not supported by some evidence in the record, as required by the Due Process Clause.  Accordingly, the California Supreme Court's rejection of petitioner's claim was an unreasonable application of the some evidence standard as it has been set forth by the United States Supreme Court.

      B.      Remaining Claims

Petitioner's other claims referencing the Contract Clause, Ex Post Facto Clause, Double Jeopardy Clause, and right to impartiality are without merit. Given the determination that relief be granted for a due process violation, those additional claims need not be examined in detail herein.

## VI.  CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that

(1)     Petitioner's application for writ of habeas corpus be GRANTED;

(2)     The Board of Parole Hearing's August 14, 2002 determination that petitioner was suitable for parole be reinstated; and

(3)     Respondent be directed to release petitioner from custody, within 10 days after any order adopting these findings and recommendations, in accordance with the Board's August 14, 2002 decision.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written

1  objections with the court and serve a copy on all parties.  Such a document should be captioned
2  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
3  shall be served and filed within ten days after service of the objections.  The parties are advised
4  that failure to file objections within the specified time may waive the right to appeal the District
5  Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

6  DATED: December 4, 2009

   */s/ Charlene H. Sorrentino*
   CHARLENE H. SORRENTINO
   UNITED STATES MAGISTRATE JUDGE